IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:06-CT-3018-H

| | |
|---|---|
| WILLIE BROWN, JR., N.C. DOC #0052205,<br>　　　Plaintiff,<br><br>　　　v.<br><br>THEODIS BECK, Secretary, North Carolina<br>Department of Corrections, Raleigh, North<br>Carolina, MARVIN L. POLK, Warden, Central<br>Prison, Raleigh, North Carolina, and UNKNOWN<br>EXECUTIONERS, Individually, and in their<br>Official Capacities,<br>　　　Defendants. | **ORDER** |

Before the Court today is the condemned Willie Brown, Jr.'s motion for a preliminary injunction barring Defendants from executing him pursuant to North Carolina's current lethal injection protocol. Brown contends that the protocol fails to ensure that inmates are properly anesthetized prior to execution, causing excruciating pain in violation of the Eighth Amendment's prohibition on the use of "cruel and unusual" punishment, applicable to states through the Fourteenth Amendment. A preliminary injunction is necessary, Plaintiff contends, to allow the parties and this Court time to fully review the protocol and to arrive at a reasoned determination of its constitutionality or lack thereof.

STATEMENT OF THE CASE

Willie Brown, Jr. is a state inmate convicted of first-degree murder and sentenced to death. *See State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985). For more than two decades, Brown has appealed his conviction and death sentence to North Carolina's appellate courts and

to every level of the federal court system. None of these appeals has resulted in alteration of his conviction or sentence.[1] He is currently scheduled to be executed by lethal injection on April 21, 2006.

Brown no longer challenges his conviction or the validity of his death sentence. Instead, in this action filed pursuant to 42 U.S.C. § 1983, Brown challenges North Carolina's lethal injection protocol and the procedures Defendants intend to employ in effecting his execution on April 21, 2006. Specifically, Brown contends that the protocol and procedures Defendants intend to use are constitutionally deficient in the following ways:

> 1. Defendants' protocol fails to ensure that the personnel responsible for anesthesia are appropriately trained and qualified;
>
> 2. Defendants' protocol lacks adequate standards for administering injections and monitoring consciousness; and
>
> 3. Defendants fail to make adequate efforts to identify and address contingencies that may arise during execution.

Counsel for both parties have, in recent weeks, engaged in extensive briefing of this matter. The arguments made on both sides have been well reasoned and expertly presented. This Court held a status conference in this matter on March 27, 2006. Subsequently, on April 6, 2006, the Court heard arguments from learned counsel for Mr. Brown and Defendants. This matter is now ripe and must be decided expeditiously, as the date of Mr. Brown's execution is imminent.

---

[1] In 2003, the Fourth Circuit Court of Appeals reversed this Court's finding of procedural default as to Plaintiff's habeas claim concerning an instruction requiring juror unanimity as to mitigating circumstances. *See Brown v. Lee*, 319 F.3d 162 (4th Cir. 2003). On remand, the Court determined that the instruction given was indistinguishable from the one found unconstitutional in *McKoy v. North Carolina*, 494 U.S. 433 (1990) but that Plaintiff was not entitled to habeas relief because *McKoy* did not apply retroactively to cases, like Plaintiff's, that became final prior to the *McKoy* decision. *See Brown v. Polk*, No. 5:98-HC-774-H (E.D.N.C. Aug. 25, 2004) (relying on *Beard v. Banks*, 542 U.S. 406 (2004)).

## North Carolina's Execution Protocol

The State of North Carolina executes death row inmates by lethal injection. N.C. Gen. Stat. §§ 15-187, -188. Pursuant to the execution protocol adopted by Defendants, lethal injection is performed by the administration of three chemical substances: (1) sodium thiopental or sodium pentothal, a short-acting barbituate; (2) pancuronium bromide or Pavulon, a neuromuscular blocking agent that causes total muscle paralysis; and (3) potassium chloride, which causes cardiac arrest. Each of these chemicals is injected separately into two intravenous lines leading to the inmate's body. The first set of syringes contains a total of 3000 mg. of sodium pentothal. The second syringes contain saline to flush the IV line clean. The third set of syringes contains a total of 40 mg of pancuronium bromide. The fourth set of syringes contains a total of 160 mEq of potassium chloride. The fifth set of syringes contain saline to again flush the IV line clean.

Plaintiff does not dispute that, if administered properly, 3000 mg of sodium pentothal will render an individual unconscious and unable to perceive pain. Plaintiff, however, claims that the execution protocol is inadequate to ensure that an appropriate plane of anesthesia is induced and maintained prior to execution. The neuromuscular blocking agent paralyzes voluntary muscles but does not affect consciousness or the perception of pain. As a consequence, Plaintiff contends, an individual will appear unconscious while, in fact, he may be "experienc[ing] excruciating pain as a result of the conscious asphyxiation caused by pancuronium bromide and the painful burn and cardiac arrest caused by the injection of potassium chloride." (Am. Compl. ¶¶ 11, 12.) Plaintiff further challenges the protocol on the grounds that it fails to require the presence of medical personnel trained in anesthesia and that it lacks other medically necessary safeguards to ensure that an individual is properly sedated prior to the administration of the

pancuronium bromide and potassium chloride or to provide guidance to the executioners in the event of problems. (Am. Compl. ¶¶ 18-20.)

As an alternative to the execution protocol, Plaintiff suggests that Defendants instead use a long-acting barbituate, such as pentobarbital or secobarbitol. According to Plaintiff these substances cause both unconsciousness and death if properly administered.[2] Plaintiff further suggests that Defendants establish appropriate protocols to monitor the "level of consciousness prior to injection of [the] other chemical[s];" "to require the presence of medical personnel credentialed, licensed, and proficient in the practice of anesthesia;" "to eliminate unnecessary physical barriers to direct visual and tactile monitoring;" and "to make provisions for responding to foreseeable issues that may arise during the execution." (Mem. Supp. Prelim. Inj. at 21-22.)

## PRELIMINARY INJUNCTION STANDARD

In determining whether Brown is entitled to a preliminary injunction, the Court is guided by the hardship balancing test set forth in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977). This test requires the Court to consider four factors:

    (1) the likelihood of irreparable harm to the plaintiff if injunctive relief is denied;

    (2) the likelihood of harm to the defendants if injunctive relief is granted;

    (3) the likelihood that the plaintiff will succeed on the merits; and

    (4) the public interest.

*Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir. 1991) (citing *Blackwelder*). It "correctly emphasizes that, where serious issues are before the court, it is a sound idea to

---

[2] Plaintiff notes that protocols utilizing such long-acting barbituates have been adopted by the American Veterinary Medical Association and by physicians under Oregon's Death with Dignity Act.

maintain the status quo ante litem, provided it can be done without imposing too excessive an interim burden upon the defendant." *Blackwelder*, 550 F.2d at 194-95. Thus, the most important factors are the likelihood of irreparable harm to the plaintiff and the likelihood of harm to the defendants. *Rum Creek*, 926 F.2d at 359. "If, after balancing those two factors, the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* (citations omitted) (quoting *Blackwelder*, 550 F.2d at 195).

"The inability to obtain damages from the State in a § 1983 action reduces the showing necessary to establish irreparable harm." *Id.* at 360. Because injunctive and declaratory relief are the only remedies available, "the showing necessary to meet the irreparable harm requirement for a preliminary injunction should be less strict than in other instances where future monetary remedies are available." *Id.* at 362. Where, however, a stay of execution is sought, the court must also consider whether the inmate has unnecessarily delayed bringing the claim. "Given the State's significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004) (citations omitted).

## DISCUSSION

This is not the first time that an individual has challenged a state's execution protocol for the reasons cited by Plaintiff. Since the Supreme Court's decision in *Nelson*, inmates facing execution have raised similar claims throughout the country, contending they are at significant

risk of needlessly and consciously suffering excruciating pain.³ *See, e.g., Morales v. Hickman*, 415 F. Supp. 2d 1037 (N.D. Cal. 2006); *Smith v. Johnson*, No. Civ.A. H-06-450, 2006 WL 644424 (S.D. Tex. Feb. 13, 2006), *aff'd*, 440 F.3d 262 (5th Cir. 2006); *Evans v. Saar*, 412 F. Supp. 2d 519 (D. Md. 2006); *Rutherford v. Crosby*, No. 4:06-CV-50/MCR, 2006 WL 228883 (N.D. Fla. Jan. 28, 2006), *aff'd*, 438 F.3d 1087 (2006); *Anderson v. Evans*, No. CIV-05-0825-F, 2006 WL 83093 (W.D. Okla. Jan. 11, 2006); *Ross v. Rell*, 392 F. Supp. 2d 224 (D. Conn. 2005); *Beardslee v. Woodford*, No. C 04-5381 JF, 2005 WL 40073 (N.D. Cal. Jan. 7, 2005), *aff'd*, 395 F.3d 1064 (9th Cir. 2005); *Reid v. Johnson*, 333 F. Supp. 2d 543 (E.D. Va. 2004); *Harris v. Johnson*, 323 F. Supp. 2d 797 (S.D. Tex. 2004), *vacated*, 376 F.3d 414 (5th Cir. 2004); *Oken v. Sizer*, 321 F. Supp. 2d 658 (D. Md. 2004); *Cooper v. Rimmer*, No. C 04 436 JF, 2004 WL 231325 (N.D. Cal. Feb. 6, 2004); *Bieghler v. Indiana*, 839 N.E.2d 691 (Ind. 2005); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005). In this Court alone, there have been six § 1983 actions challenging North Carolina's execution protocol.⁴ Of the various federal and state cases, the Court is aware of only four cases since *Nelson* in which injunctive relief has been granted based on challenges to a state's execution protocol. In each of those cases, the stay was

---

³In fact, the principal experts involved in this case, Dr. Mark J. S. Heath and Dr. Mark Dershwitz, are the same experts relied upon by the parties in a number of these cases. *See, e.g., Morales v. Hickman*, 415 F. Supp. 2d 1037 (N.D. Cal. 2006); *Evans v. Saar*, 412 F. Supp. 2d 519 (D. Md. 2006); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005) (Heath only) ; *Beardslee v. Woodford*, No. C 04-5381 JF, 2005 WL 40073 (N.D. Cal. Jan. 7, 2005), *aff'd*, 395 F.3d 1064 (9th Cir. 2005); *Reid v. Johnson*, 333 F. Supp. 2d 543 (E.D. Va. 2004).

⁴The other five actions filed in this Court are *Page v. Beck*, No. 5:04-CT-4-BO (formerly designated as *Rowsey v. Beck*), which was filed by four inmates challenging the execution protocol formerly used by the State of North Carolina; *Conner v. Beck*, No. 5:06-CT-3032-D; *Perkins v. Beck*, No. 5:04-CT-643-BO; *Boyd v. Beck*, No. 5:05-CT-774-D; and *Moody v. Beck*, No. 5:06-CT-3020-D. *Perkins*, *Boyd* and *Moody* have previously been dismissed. *Page* and *Conner* are still pending before the Court.

ultimately vacated on appeal. *See Bieghler v. Donahue*, 2006 WL 229027 (7th Cir.), *vacated*, 126 S. Ct. 1190 (2006); *Harris v. Johnson*, 323 F. Supp. 2d 797 (S.D. Tex.), *vacated*, 376 F.3d 414 (5th Cir. 2004); *Oken v. Sizer*, 321 F. Supp. 2d 658 (D. Md.), *vacated*, 542 U.S. 916 (2004); *Perkins v. Beck*, No. 5:04-CT-643-BO (Oct. 1, 2004), *vacated*, 543 U.S. 920 (2004). In *Moody*, this Court recently denied the plaintiff's request for injunctive relief because he had delayed filing his § 1983 complaint until thirteen days before his scheduled execution. Based on the record before it, the Court further concluded that "the relative harm to the parties also weigh[ed] against granting injunctive relief." *Moody v. Beck*, No. 5:06-CT-3020-D (Mar. 14, 2006) at 7.

The Northern District of California recently considered claims similar to those raised by Plaintiff and denied injunctive relief on condition that the State of California would agree to modify its execution protocol to address certain concerns raised by the plaintiff. Acknowledging that "no court has found either lethal injection in general or a specific lethal-injection protocol in particular to be unconstitutional," the court noted that the record before it was much more extensive and included "evidence of a kind that was not presented" in the other cases. *Morales*, 2006 WL 335427, *5. The *Morales* Court expressed specific concern with information contained in logs from a number of executions suggesting that inmates may have continued breathing more than a minute after the administration of sodium thiopental. The court noted that this evidence appeared contrary to Dr. Dershwitz's opinion, which had been relied upon in other cases, that the amount of sodium thiopental used would cause an inmate to stop breathing and lose consciousness within a minute after administration began. While acknowledging Dr. Dershwitz's explanation that these "respirations" may have simply been "chest wall movements" and not respirations, the court concluded that the evidence before it raised some doubt whether

California's execution protocol was functioning as intended. Based on these concerns, the court determined that preservation of "both the State's interest in proceeding with [Morales'] execution and [Morales'] constitutional right not to be subject to an undue risk of extreme pain" would be best served by denying Morales' motion for injunctive relief provided that the State agreed either to use only barbituates in executing Morales or to have an individual trained and experienced in the field of general anesthesia to ensure that Morales was rendered unconscious prior to the administration of pancuronium bromide or potassium chloride. *Morales*, 2006 WL 335427, at *8.

While the Court does not fashion its order based solely on *Morales*, the Court does find the *Morales* decision persuasive. As in *Morales*, Plaintiff here has presented evidence of a kind that is different from that presented in the cases previously considered by this and other courts. Among this evidence is toxicology data from four recent North Carolina executions showing post-mortem levels of sodium pentothal ranging from 1.5 mg/L to 42 mg/L.[5] At the very least, this evidence appears contrary to Dr. Dershwitz's opinion that a man of average size injected with 3000 mg of sodium pentothal would have an expected concentration of 40 mg/L ten minutes later and a concentration of 33 mg/L twenty minutes later. In response, Defendants have filed an affidavit of Dr. Dershwitz in which it is stated that the discrepancies between the post-mortem toxicology results and his predictions may be explained by a number of factors, including the following: (i) that his predictions are based on arterial blood concentrations, whereas the post-

---

[5]Toxicology results of blood samples taken from the left femoral vessel of Steven Van McHone, who was executed November 11, 2005, indicate sodium pentothal levels of 1.5 mg/L and 21 mg/L. Similar tests revealed sodium pentothal levels of 4.4 mg/L, 11 mg/L and 12 mg/L in Elias Syriani, who was executed November 18, 2005; 11 mg/L and 29 mg/L in Kenneth Boyd, executed December 2, 2005; and 8.7 mg/L, 12 mg/L and 42 mg/L in Perrie Dyon Simpson, following his execution on January 20, 2006.

mortem samples may not have been arterial blood samples; (ii) that sodium pentothal is subject to postmortem redistribution, causing a decrease in the blood concentration with time lapse; (iii) that due to the administration of the potassium chloride, blood circulation may have stopped prior to equilibration of the sodium pentothal concentrations between the arterial and venous circulatory systems; and (iv) there would be a systematic decrease in the reported concentrations due to delays in obtaining and shipping the samples and improper storage of the samples. While Dr. Dershwitz's explanation may be correct, the Court cannot ignore the serious questions raised by this data. This is especially true considering that the blood samples of which Dr. Dershwitz complains were collected, shipped, stored and analyzed at Defendants' direction by agents of the State for the express purpose of determining whether inmates executed under Defendants' protocol are receiving sufficient anesthesia prior to the administration of the pancuronium bromide and potassium chloride.

Plaintiff also relies on affidavits from attorneys who report having witnessed individuals writhing, convulsing, and gagging when executed. For example, Heather Wells, an attorney for Eddie Ernest Hartman, reports that Eddie appeared to suffer for at least five minutes after the lethal injection. She states that "Eddie's throat began thrusting outward and collapsing inward. His neck pulsed, protruded, and shook repeatedly. Eddie's chest at first pulsated frequently, then intermittently, and at least twice I saw Eddie's chest heave violently. . . . Throughout the execution, Eddie's eyes were partly open while his body relentlessly convulsed and contorted." (Mem. Supp. Prelim. Inj., Ex. K, ¶¶ 7-9, 12 (paragraph numbers omitted).) Kim Stevens and Cynthia Adcock report similar observations during the executions of John Daniels, Willie Fisher, and Timmy Keel. (Mem. Supp. Prelim. Inj., Exs. J, L.) Ms. Adcock states that she witnessed

9

three executions by lethal injection in the State of North Carolina. The first was Zane Hill. Ms. Adcock states that in the hours preceding his death Mr. Hill was heavily medicated and behaved similar to someone who was intoxicated. When he was executed, he appeared unconscious, and he never opened his eyes or grimaced. She states that was not the case, however, with the executions of Willie Fisher and Timmy Keel. According to Ms. Adcock, Mr. Fisher's execution commenced at 9:00 p.m. and concluded at 9:21 p.m. Ms. Adcock states that Mr. Fisher appeared to lose consciousness around 9:00 p.m., but subsequently began convulsing. She states that he looked as though he was trying to catch his breath but could not and that his eyes were open as his chest heaved repeatedly. She further reports watching Timmy Keel's body "twitching and moving about" for approximately ten minutes. Kim Stevens describes a similar scene with the execution of John Daniels:

> Mr. Daniels lay still for a moment after the Warden's announcement [that the execution would proceed], and turned his face away from us. Then, all of a sudden he started to convulse, violently. He sat up and gagged. We could hear him through the glass. A short time later, he sat up and gagged and choked again, and struggled with his arms under the sheet. He appeared to me to be in pain. He finally lay back down and was still.

(Mem. Supp. Prelim. Inj., Ex. L, ¶ 5.) According to Dr. Heath, "[w]itness accounts of writhing and convulsing during execution are not consistent with a sufficient dose of [sodium pentothal] having been successfully delivered to the brain such that the condemned inmate does not feel pain." (Mem. Supp. Prelim. Inj., Ex. F, ¶ 31.) While these particular executions took place prior to Defendants' adoption of the current execution protocol, the amount of sodium pentothal administered during these executions was the same as under the current protocol (3000 mg), it was simply administered in a different sequence. Thus, evidence of the problems associated with these executions while, perhaps, not clearly indicative of the current protocol, does raise some

concerns about the effect of North Carolina's protocol.

As to the balance of hardship, Brown contends:

> The excruciating pain that Plaintiff will suffer during his execution clearly constitutes irreparable harm. Moreover, Plaintiff will have no meaningful retrospective remedy, as he will no longer be alive. Indeed, the Fourth Circuit has recognized that, because of the absence [of] retrospective remedies, the showing required for a preliminary injunction is less strict in cases involving an alleged violation of rights under Section 1983. *See Rum Creek*, 926 F.2d 353, 362 (4th Cir. 1991).
>
> . . . .
>
> Defendants will incur minimal, if any, harm if they are enjoined from conducting Plaintiff's execution using their intended inadequate protocol. Plaintiff seeks only to enjoin Defendants from doing what they have no right or need to do – employing an inadequate protocol for inducing and maintaining anesthesia with blatant disregard for the conscious suffering and excruciating pain Plaintiff will experience as a result. Plaintiff does not seek to prevent Defendants from carrying out his execution, or even from carrying out his execution by lethal injection, a fact that minimizes any risk of harm to Defendants.
>
> There is no obstacle, other than Defendants' own refusal, to the adoption of [] alternative procedures or other measures that would ensure proper induction and monitoring of anesthesia throughout the course of the lethal injection process. . . .
>
> Finally, Plaintiff's lack of undue delay in bringing this claim further tips the equitable balance in Plaintiff's favor. From the time of his conviction until the denial of his Petition for Writ of Habeas Corpus on 27 February 2006, Plaintiff has continuously pursued state and federal appeals and post-conviction proceedings in an effort to obtain a new trial or sentencing hearing. In fact, in 2003, the Fourth Circuit concluded that Plaintiff was entitled to a new sentencing hearing because of constitutional errors affecting his death sentence. Due to an intervening decision of the United States Supreme Court, his Petition was subsequently dismissed without re-sentencing. Any challenge to Defendants' anesthesia protocol prior to the denial of his federal habeas petition would have been premature, given that a favorable habeas ruling would have mooted a claim under Section 1983 and rendered any ruling on this matter advisory.
>
> After the United States Supreme Court denied certiorari with respect to Plaintiff's habeas petition, eliminating all legal barriers to the State's ability to

schedule Plaintiff's execution, Plaintiff moved promptly to assert his claim, filing his Complaint the same day the Supreme Court's order was issued and before an execution date was set.

(Mem. Supp. Prelim. Inj. at 9, 20-23 (parenthetical omitted) (citations omitted).)

Defendants, on the other hand, assert that Brown cannot show he will suffer irreparable harm. According to Defendants:

> Plaintiff will not suffer physically because he will be rendered fully unconscious by the administration of thiopental sodium before the injection of pancuronium bromide and will remain so until he is declared dead. . . .
>
> . . . .
>
> On the other hand, the State of North Carolina suffers irreparable harm because of its inability to enforce its criminal judgments. . . . The citizens of North Carolina have a strong interest in seeing the judgment rendered in Plaintiff's criminal case carried out. More than twenty years have passed since a North Carolina jury found Plaintiff guilty of capital murder beyond a reasonable doubt and further decided the aggravating circumstance of the crimes [sic] outweighed the circumstances mitigating the punishment. The verdicts and judgments have been upheld by the North Carolina Supreme Court and sustained by the federal courts. Although the statute prescribing lethal injection as the sole form of capital punishment in North Carolina . . . had been in effect since 1988, Plaintiff did not challenge the State's method of execution until shortly before the time when the State set the date for his execution. Such a deliberate dilatory tactic by a criminal defendant is a ground for denying equitable relief. Such tactics irreparably harm the State and are contrary to the public interest.

(Mem. Opp. Prelim. Inj. at 35-42 (citations omitted).)

On balance, the Court concludes that the likelihood of irreparable harm to Brown far exceeds the likelihood of harm to Defendants. Serious questions have been raised by the evidence concerning the effect of the current execution protocol. If the alleged deficiencies do, in fact, result in inadequate anesthesia prior to execution, there is no dispute that Brown will suffer excruciating pain as a result of the administration of pancuronium bromide and potassium chloride. Moreover, if the State of North Carolina is permitted to execute Brown as scheduled,

on April 21, 2006, Brown will be deprived of any opportunity to pursue this action or to seek redress in the event he suffers a torturous death. The Court recognizes the State's significant interest in finality and the enforcement of its criminal judgments. However, the Court determines that it would be inappropriate to allow Defendants to proceed with Mr. Brown's execution under the current protocol considering the substantial questions raised. Although Plaintiff may have been able to file this action prior to the time he did, this case is not like *Moody*, where the plaintiff waited until fifteen days prior to his scheduled execution before filing his § 1983 action. In this case, Plaintiff filed his action the same day the Supreme Court denied certiorari in his case and prior to the time his execution was scheduled. Considering the Fourth Circuit's decision remanding the case for consideration of Plaintiff's *McKoy* claim and the subsequent stay entered by this Court, the Court concludes that Plaintiff's delay in filing is not so great that Plaintiff should be deprived of his only opportunity to pursue the "serious, substantial, difficult and doubtful" questions raised in this action. That said, it has been more than twenty years since Plaintiff was convicted and sentenced to death. As noted by the *Morales* Court:

> Even if the Court were to hold an evidentiary hearing and Plaintiff were to prevail, Plaintiff would remain under a sentence of death. Neither the death penalty nor lethal injection as a means of execution would be abolished. At best, Plaintiff would be entitled to injunctive relief requiring the State to modify its lethal-injection protocol to correct the flaws Plaintiff has alleged. Presumably, at some point, Plaintiff would be executed.

*Morales*, 2006 WL 335427, *7.

This Court has the authority and the responsibility to ensure that the State, if it chooses to go forward with executing Brown, does so in a manner that comports with the Eighth Amendment. *See Morales v. Hickman*, 438 F.3d 926 (9th Cir. 2006). The Court finds that Plaintiff has raised substantial questions as to whether North Carolina's execution protocol

creates an undue risk of excessive pain. However, the Court finds, as did the *Morales* Court, that the questions raised "may be addressed effectively by means other than a stay of execution, and that these alternative means would place a substantially lesser burden on the State's strong interest in proceeding with its judgment." *Morales*, 2006 WL 335427, *7. Specifically, the Court finds that the questions raised could be resolved by the presence of medical personnel who are qualified to ensure that Plaintiff is unconscious at the time of his execution.

## CONCLUSION

The Court concludes that Plaintiff's primary concern is ensuring that Plaintiff will not experience pain during the injection of pancuronium bromide and potassium chloride into his bloodstream during his execution. As the reviewer of the constitutional sufficiency of the process employed by Defendants in this matter, this is the Court's main concern as well. Therefore, based on the foregoing discussion, and after considering the blood test summaries and affidavits submitted by counsel who have viewed past executions in North Carolina, the Court concludes this issue must be addressed before Willie Brown's execution may go forward.

Accordingly, the Court hereby conditionally DENIES Plaintiff's motion for preliminary injunction, and Plaintiff's execution may proceed as scheduled on April 21, 2006, on the condition that there are present and accessible to Plaintiff throughout the execution personnel with sufficient medical training to ensure that Plaintiff is in all respects unconscious <u>prior to</u> and <u>at the time of</u> the administration of any pancuronium bromide or potassium chloride. Should Plaintiff exhibit effects of consciousness at any time during the execution, such personnel shall immediately provide appropriate medical care so as to insure Plaintiff is immediately returned to an unconscious state.

On or before April 12, 2006, at 12:00 noon, Defendants shall file with this Court and serve upon Plaintiff a notice setting forth the plans and qualifications of such personnel. Plaintiff may file any objections to the plans and/or qualifications of such personnel on or before 5:00 p.m. on April 14, 2006. In the event Defendants fail to provide such information or choose not to proceed with Plaintiff's execution in this manner, a preliminary injunction including a stay of execution will issue immediately, without the necessity of further proceedings. A schedule for discovery and future hearings shall be entered forthwith thereafter. In no event shall a stay of execution remain in effect for more than 180 days without an order of this Court finding extraordinary circumstances warranting extension of the stay.

This the 7th day of April 2006.

MALCOLM J. HOWARD
SENIOR UNITED STATES DISTRICT JUDGE